Thomas D. LILLARD and Nell P. Lillard, individually and as parents and next friends of minor child, Andrea Lillard; David McCarter, Carol L. McCarter, and Julie McCarter; David C. Little and Brenda J. Little, individually and as parents and next friends of minor child, Lori Briana Little, Plaintiffs–Appellants,

v.

SHELBY COUNTY BOARD OF EDUCATION; James R. Anderson, Superintendent, Shelby County Schools; Ernest Chism, Principal, Germantown High School; and Gary Leventhal, Defendants–Appellees.

No. 94–5694.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 15, 1995.

Decided Feb. 21, 1996.

Louis R. Lucas (argued and briefed), Memphis, TN, for plaintiffs-appellants.

J. Cecil McWhirter (briefed), Walsh, McWhirter & Wyatt, Memphis, TN, for James R. Anderson, Ernest Chism.

Buckner P. Wellford (briefed), Cheryl R. Estes (argued), Thomason, Hendrix, Harvey, Johnson & Mitchell, Memphis, TN, for Gary Leventhal.

Jennifer A. Beene (argued), County Attorney's Office for County of Shelby, J. Minor Tait, Jr., McDonald Kuhn, Memphis, TN, for Shelby County Bd. of Educ.

Before NELSON, RYAN, and McKAY,* Circuit Judges.

RYAN, J., delivered the opinion of the court, in which McKAY, J., joined. NELSON, J. (p. 730), delivered a separate opinion concurring in the judgment.

RYAN, Circuit Judge.

The plaintiffs appeal from the district court's judgment granting, in part, the defendants' motions to dismiss or for summary judgment in this suit alleging violations of Title IX, 20 U.S.C. §§ 1681–1688, and of the First and Fourteenth Amendments, through 42 U.S.C. § 1983, arising out of the conduct of Gary Leventhal, a coach and teacher at Germantown High School in Shelby County, Tennessee. The plaintiffs, three girls who attended Germantown High School and their parents, sued Leventhal; the Shelby County Board of Education; James Anderson, the Superintendent of Shelby County Schools; and Ernest Chism, the Principal of Germantown High School.

The appeal presents a number of complex issues. We first consider whether Title IX's statutory remedy precludes the plaintiffs from bringing a substantive due process claim under section 1983, an argument made by the defendants for the first time on appeal, and conclude that this argument is without merit. We also consider the plaintiffs' arguments that the district court erred in dismissing Lillard's and Little's substantive due process claims on the ground that Leventhal's conduct toward them does not shock the conscience; in dismissing the First Amendment claims of Lillard and Little on the ground that they were not stated with sufficient specificity; in granting summary judgment to the School Board, Anderson, and Chism on the constitutional claims of McCarter, on the ground that these defendants had no notice or knowledge of Leven-

---

* The Honorable Monroe G. McKay, Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

thal's actions; and in dismissing the Title IX claims of Lillard and McCarter on statutes of limitations grounds.

Because we conclude that the district court erred with regard to its determination of the limitations period applicable to Title IX, we will reverse its dismissal of Lillard's and McCarter's Title IX claims. In all other respects, however, we will affirm.

## I.

Gary Leventhal was hired by Principal Ernest Chism in 1986 to be a physical science teacher and girls' soccer coach for Germantown High School. By August 1992, Leventhal had been removed from the coaching position, because of numerous complaints against him, including the following, which are at issue in this lawsuit.

### A. Andrea Lillard

On August 30, 1991, Andrea Lillard was 14 years old and had been in high school only two weeks. Leventhal, her physical science teacher and soccer coach, detained her after class and verbally abused her, in an unspecified manner, for unspecified reasons. He then held her chin with one hand and slapped her across the face—a slap which was, Leventhal told Andrea's mother, "perhaps harder than he meant." Leventhal also made unspecified threats to Andrea after the slapping.

Two and a half weeks later, on September 18, Andrea and her father first met with Principal Chism to discuss the incident. Mr. Lillard allegedly told Principal Chism that he believed Leventhal's conduct constituted sexual harassment. Principal Chism promised that "fast and decisive action would be taken." When he heard nothing further, Mr. Lillard again contacted Principal Chism on September 19 and on September 23. On September 23, Principal Chism told Mr. Lillard that he had spoken with the girls on Leventhal's soccer team, who had said that Leventhal "was demoralizing ... them by the way he treated them." Principal Chism nonetheless had not made up his mind about the appropriate course of action.

Mr. Lillard then called Superintendent Anderson and informed him of the slapping incident and of his subsequent conferences with Principal Chism. After speaking with Principal Chism, Superintendent Anderson told Mr. Lillard that Leventhal's actions were "without malice."

It appears from the record that Mr. Lillard then sent a letter to the Board of Commissioners of Shelby County, complaining of Leventhal's "alleged sexual harassment" of Andrea. A copy of this letter was forwarded to Superintendent Anderson by the Chairman of the Board, who specifically pointed out the sexual harassment charge. Mr. Lillard wrote to the Board of Commissioners a second time, and again complained of the alleged sexual harassment of Andrea.

The defendants now take the position that they did not believe, for three reasons, Andrea's claim that Leventhal had slapped her: first, Leventhal, although known to be verbally abusive as a coach and occasionally "reprimanded" for "inappropriate verbal remarks," had never had a "history of striking children"; second, Andrea "has a past history of not being truthful," having once lied to the principal in connection with drinking on school property; and finally, Andrea's behavior following the incident was "inconsistent with her having experienced abuse," because she tried to get back on the soccer team and continued going to Leventhal's class.

There is an affidavit in the record from James Franklin, an FBI agent who is not a party to this lawsuit, and who is a self-described "close follower and supporter of the Germantown High School athletic program." After he learned about the slapping incident, Franklin contacted Principal Chism and told him he had observed Leventhal's cursing and verbally abusing the girls at practices and games, and had "observed Leventhal hitting the girls on their buttocks." In response, Principal Chism told Franklin that he had known Leventhal "was a problem when he came there" and had a "book an inch thick already" of complaints. Franklin then called Superintendent Anderson and reported the same information. In response, he was told that Anderson "would look into it." Franklin did not, it appears, have any

knowledge of Andrea Lillard's complaints, or of those of the other plaintiffs.

## B. Julie McCarter

Beginning in the early spring of 1991, the McCarter family changed their residence several times in connection with Mr. McCarter's new employment in Atlanta, Georgia. Julie apparently moved back and forth, but eventually stayed in Germantown with her grandparents, and later, in the late summer of 1991, returned to live with her parents when they moved back to Germantown. Because of Julie's brief residence in Atlanta, however, she needed to make a special application in order to be allowed to play soccer for Germantown. It appears that Leventhal in some way impeded the application, telling the soccer team captain that he was "holding the . . . papers and would send them in when [he] was ready." It further appears that Julie was only allowed to play after her mother went to Leventhal and "beg[ged]." Leventhal told Julie that he would let her back on the team, but "she would have to 'kiss his ass' for the rest of the season." Her parents also had to promise not to complain any more about his conduct.

The latter demand appears to have arisen from Mr. McCarter's complaints, beginning in August 1990, to Principal Chism about Leventhal's conduct as a coach. Specifically, he "express[ed] [his] concern over the way Leventhal treated the girls. [He] made specific reference to [Leventhal's] sexual language, his verbal abuse and treatment." He told both Principal Chism and Superintendent Anderson, as well as an unnamed School Board official, "about Leventhal not keeping his hands to himself when dealing with these girls."

In September 1991, Mrs. McCarter wrote to one Mr. Hayslip, who is in charge of athletics in the school system but is not a party to this suit, regarding Leventhal's behavior. Mrs. McCarter's letter detailed the verbal abuse Leventhal inflicted on the girls, and specified that the "girls are afraid of him." On one occasion, Leventhal told Julie that her father was an "asshole" and a "liar." The letter also detailed Leventhal's practice of calling Julie, and other girls at home, and

"play[ing] mind games" by accusing them of not truly wishing to play for him. The McCarters claim that they conveyed the same information verbally to Superintendent Anderson and Principal Chism on several occasions.

Finally, the complaint contains an allegation that Leventhal "placed his hands between [Julie's] breasts" and "fondled her buttocks" on unspecified dates, and also secured duplicate keys to her room while on road trips for the soccer team.

The School Board, through its President, filed an affidavit stating that it had never been informed of any allegations of sexual harassment with regard to Julie. Superintendent Anderson's affidavit states that, although he was aware that Julie was not on the soccer team, at no time did she or her parents "ever inform [him] that they believed their daughter was being sexually harassed" or that she "had been improperly touched." Finally, Principal Chism's affidavit states that "David McCarter never complained to me that his daughter had been mistreated by Dr. Gary Leventhal or that there had been any sexual harassment by Dr. Gary Leventhal."

## C. Lori Briana Little

During the 1991–92 school year, Briana Little was a freshman in Leventhal's physical science class. The Littles allege that Leventhal abused, humiliated, and intimidated Briana in a number of ways, including staring at her, making "kissing" noises, and generally insulting her. Leventhal also telephoned Briana at home on two occasions, questioning her about her relationships with other students and instructing her to stay away from Andrea Lillard.

In the spring, Briana's parents requested that Principal Chism move her out of Leventhal's class because of this treatment. Although he initially agreed, Principal Chism and his assistant, Tim Setterlund, later called Briana to their office, and were "angry and hostile" because of her parents' complaints, telling her she was "going back in there" to Leventhal's class. Later, Setterlund told the Littles that it would be in Briana's interest to

stay in the class because of the short time left in the school year. Mrs. Little informed Setterlund that Leventhal "picked on Briana because she was a girl and would not verbally defend herself."

On May 27, 1992, the last day of school, Leventhal sent Briana a note asking her to come to his classroom. Shortly thereafter, he passed her in the hallway and rubbed her stomach, telling her "he had arranged for permission for her to come to his class ... after her last exam." It was after this incident that Briana's parents decided that "Leventhal's actions were clearly sexual in nature and that he had a problem with power over young girls." They did not mention this incident to Principal Chism or Superintendent Anderson, however, allegedly because of the previous lack of response.

The School Board, through its President, filed an affidavit stating that it had never been informed of any complaints with respect to Briana. Likewise, Superintendent Anderson filed an affidavit stating that he never received any information regarding Briana. Principal Chism's affidavit states that, although he remembers meeting with Briana and her mother, he does "not recall the detail of their complaints, however, [he] would have remembered had they made allegation [sic] of sexual harassment."

### D. District Court Proceedings

On July 2, 1992, the plaintiffs filed suit alleging violations of Title IX, the First Amendment, and substantive due process as guaranteed by the Fourteenth Amendment. The plaintiffs alleged that a pattern and practice of sex discrimination existed at Germantown High School consisting of physical and mental abuse, sexual assault, and sexual harassment by Leventhal; that the pattern existed over several years; and that it was reported to Principal Chism, Superintendent Anderson, and the School Board. Following a motion to dismiss by Leventhal, as well as a motion to dismiss or, in the alternative, for summary judgment by the School Board, Anderson, and Chism, the district court disposed of many of the plaintiffs' claims.

The district court denied Leventhal's motion to dismiss with respect to McCarter's substantive due process claim, on the grounds that "fondling and touching of her breasts by Leventhal, particularly directed toward a high school student under his direct supervision, may constitute conduct which violates due process." The court concluded, however, that Little's allegation that Leventhal rubbed her stomach while in the school hallway, and Lillard's allegation that he grabbed her chin and slapped her face, did not rise to the level of actions that were "shocking to the conscience," and thus did not state constitutional violations. The district court also granted Leventhal's motion to dismiss the First Amendment claims of Little's and Lillard's parents, on the ground that they "failed to allege sufficient facts to state a claim upon which relief can be granted." However, the court concluded that McCarter's parents' claim that their daughter was kicked off the soccer team as a result of their complaints, and reinstated conditioned upon their silence, was sufficient to withstand the motion to dismiss.

The district court concluded that the School Board, Superintendent Anderson, and Principal Chism were entitled to Eleventh Amendment immunity on both the First Amendment and substantive due process claims of all plaintiffs—although the claims of all but McCarter had already been dismissed under Fed.R.Civ.P. 12(b)(6)—reasoning that the School Board was an "arm of the state." Although McCarter's claims could have proceeded against Chism in his individual capacity (Anderson having been sued only in his official capacity), the court concluded that there was no allegation that Chism had any knowledge of the alleged sexual touching, and therefore dismissed McCarter's claims against him. The court also concluded that all three plaintiffs "have failed to establish that defendants (School Board, Anderson and Chism) were aware of or indifferent to a pattern of unconstitutional conduct by Leventhal," and therefore, as an alternative disposition, granted summary judgment in favor of those defendants in their official and individual capacities.

The district court dismissed Lillard's and McCarter's Title IX claims against all defendants on statute of limitations grounds. It

concluded that the applicable limitations period was 180 days, and that Lillard's and McCarter's claims were "based on distinct acts of discrimination that have not been timely asserted within the 180 day period." Little's Title IX claim survived, however, since it was premised on the May 27, 1992, incident, less than 180 days before the filing date of July 2, 1992.

Following the district court's Fed.R.Civ.P. 54(b) certification of its partial disposition of the plaintiffs' claims, the plaintiffs filed this timely appeal.

## II.

### A.

■ We first address an argument made by the defendants for the first time on appeal. The defendants argue that *all* of the plaintiffs' substantive due process claims should be dismissed, including those of Julie McCarter, which survived below, because the section 1983 remedy was supplanted by Title IX. The defendants' argument thus has the potential for disposing of McCarter's heretofore successful section 1983 claims, even though the defendants neglected to attempt an interlocutory appeal. This potential result suggests that a certain unfairness inheres in even addressing this issue. We further note that it is the general rule of this court not to address an issue not passed on below. *E.g., Foster v. Barilow*, 6 F.3d 405, 409 (6th Cir.1993). Nonetheless, because the answer is so clear, because the argument presents a purely legal issue which this court is well-suited to address in the first instance, and because the outcome does not implicate the potential unfairness, we will address the defendants' contentions.

The defendants rely largely on *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), in which the Supreme Court articulated what has since become known as the *National Sea Clammers* doctrine. The plaintiffs in *National Sea Clammers* brought claims for injunctive and monetary relief, alleging that the EPA and the Army Corps of Engineers permitted New Jersey and New York to discharge pollutants in violation of two federal environmental statutes, and that New Jersey and New York violated the terms of permits issued under those statutes. The Court first concluded that the statutes contained no implied private rights of action, given the "unusually elaborate enforcement provisions" expressly established, including both citizen suits and enforcement by government agencies. *Id.* at 13, 101 S.Ct. at 2623.

The Court then went on to consider whether, in the alternative, the plaintiffs could sue under section 1983, noting that in a prior case, *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Court had construed section 1983 as authorizing suits to redress violations by state officials of rights created by federal statutes. *National Sea Clammers*, 453 U.S. at 19, 101 S.Ct. at 2625–26. The Court concluded that "Congress foreclosed a § 1983 remedy" under the statutes in question, *id.*, and that no such suit was available:

> When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983.... As discussed above, [the statutes at issue] do provide quite comprehensive enforcement mechanisms. It is hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions. We therefore conclude that the existence of these express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983.

*Id.* at 20–21, 101 S.Ct. at 2626–27 (footnote and citation omitted).

There are two important distinctions that make the *National Sea Clammers* doctrine inapposite here. First, and most crucial, is the fact that in *National Sea Clammers*, the plaintiffs' section 1983 action sought to enforce the rights created by federal statutes which did not provide for a private right of action, while here, the plaintiffs' section 1983 claims are premised on alleged *constitutional*

violations. Thus, while in *National Sea Clammers,* allowing the section 1983 action to enforce the rights at issue would have effectively circumvented the implicit congressional intention to foreclose private rights of action, here, the plaintiffs' section 1983 action does not attempt either to circumvent Title IX procedures, or to gain remedies not available under Title IX. *Cf. Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1203–04 (6th Cir.1984). Instead, the plaintiffs seek to enforce wholly independent, and totally distinct, substantive due process rights. *Cf. Beardsley v. Webb,* 30 F.3d 524, 527 (4th Cir.1994); *Grano v. Department of Dev.,* 637 F.2d 1073, 1080–82 (6th Cir.1980).

The defendants offer no suggestion as to why Title IX should be deemed to supplant independently existing constitutional claims; indeed, they appear not to even recognize this essential distinction between the *National Sea Clammers* doctrine and the argument they advance. Plainly, *National Sea Clammers* does not, on its face, stand for the proposition that a federal statutory scheme can preempt independently existing constitutional rights, which have contours distinct from the statutory claim, thus prohibiting a section 1983 action grounded in substantive due process. Instead, that case speaks only to whether federal statutory rights can be enforced both through the statute itself *and* through section 1983. We recognize, however, that the Supreme Court has held that Congress may create a statutory vehicle as an alternative to section 1983, and intend for parties to bring their constitutional claims through that alternative statute. In *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Court concluded that the Education of the Handicapped Act, 20 U.S.C. § 1400 *et seq.,* was intended to be "the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education," *id.* at 1009, 104 S.Ct. at 3467, thereby precluding a section 1983 action, because the constitutional claims were "virtually identical" to the statutory EHA claims, and because of a legislative history indicating a congressional intention to preclude reliance on section 1983 as a remedy. Neither factor appears here.

The defendants face a subsidiary difficulty in their argument. In contrast to the statutes at issue in *National Sea Clammers,* Title IX contains no comprehensive enforcement scheme. In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court held that Title IX provided an *implied* private cause of action, largely in view of the statute's otherwise lack of private enforcement mechanisms. The Court noted that "[t]he statute does not … expressly authorize a private right of action," and that the only enforcement mechanism expressly provided for was "a procedure for the termination of federal financial support for institutions violating" Title IX. *Id.* at 683, 99 S.Ct. at 1950–51. The Court concluded that implying a private right of action would "provide effective assistance to achieving the statutory purposes" of ending discrimination, as a complement to the public remedy explicitly created in the statute. *Id.* at 707, 99 S.Ct. at 1963. One can only conclude, therefore, that *National Sea Clammers* does not speak to Title IX, since there is no evidence in Title IX that "Congress intended to foreclose [a section 1983] action by providing an exclusive remedy within" Title IX. *See Carelli v. Howser,* 923 F.2d 1208, 1210 (6th Cir.1991). Thus, even if the defendants' argument had been directed at an attempt by the plaintiffs to enforce their Title IX rights, rather than their constitutional rights, through section 1983, *National Sea Clammers* would have provided no support.

We recognize that despite the important differences between the *National Sea Clammers* holding and the defendants' position—that Title IX should supplant substantive due process claims—the Third Circuit has held that constitutional claims under section 1983 are "subsumed" in Title IX. *Pfeiffer v. School Bd. for Marion Ctr. Area,* 917 F.2d 779, 789 (3d Cir.1990); *accord Williams v. School Dist. of Bethlehem,* 998 F.2d 168, 176 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994). However, it did so with virtually no analysis, simply citing *National Sea Clammers* for its general proposition, and apparently accepting the judgment of several district courts that Title IX's enforcement scheme was "sufficiently

comprehensive" to necessitate foreclosure of *all* section 1983 claims, irrespective of the substantive genesis of those claims. *Pfeiffer,* 917 F.2d at 789. We are not persuaded by this reasoning.

In sum, the *National Sea Clammers* doctrine presents no impediment to the plaintiffs' pursuit of remedies for alleged violations of substantive due process.

## B.

Turning now to the plaintiffs' arguments, we consider first their contention that the district court erred in dismissing Lillard's and Little's substantive due process claims on the grounds that these plaintiffs failed to allege any conduct by Leventhal sufficient to state a violation of substantive due process. In this regard, the plaintiffs make a thoroughly unhelpful argument, taking the district court to task for utilizing the "shocks the conscience" standard first articulated in the excessive-force context, yet simultaneously failing to suggest to this court any legal standard they would deem more appropriate.

The district court's dismissal of a civil rights complaint under Fed.R.Civ.P. 12(b)(6) "is scrutinized with special care." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994). "The Supreme Court has stated that 12(b)(6) motions should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Our duty is to "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Id.* While " 'a complaint need not set down in detail all the particularities of a plaintiff's claim,' the complaint must give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (citations omitted).

Section 1983 provides that one who, under color of state law, deprives another of the "rights, privileges, or immunities secured by the Constitution and laws, shall be liable" for damages. Thus, the threshold inquiry for bringing a claim under section 1983 is "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979) (citation omitted). As the Supreme Court explained in *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Due Process Clause of the Fourteenth Amendment bars "certain government actions regardless of the fairness of the procedures used to implement them." *Id.* at 331, 106 S.Ct. at 665. This is "the concept embodied in the phrase 'substantive due process,'" *Lewellen v. Metropolitan Government of Nashville,* 34 F.3d 345, 346 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995), and this is the general theory underlying the plaintiffs' section 1983 claims.

This court has recognized two categories of substantive due process rights:

> The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims under "the Fourteenth Amendment *simpliciter.*"
>
> . . .
>
> The other type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. The test for substantive due process claims of this type is whether the conduct complained of "shocks the conscience" of the court.

*Mertik v. Blalock,* 983 F.2d 1353, 1367–68 (6th Cir.1993). The first type of claim exists, for example, when a plaintiff alleges that his right to be free from unreasonable seizures under the Fourth Amendment was violated. *See Wilson v. Beebe,* 770 F.2d 578, 585–86 (6th Cir.1985) (*en banc*); *see also Braley v. City of Pontiac,* 906 F.2d 220, 225 (6th Cir. 1990). The latter type of claim, however, does not "require[ ] a claim that some specific guarantee of the Constitution apart from the due process clause be violated.... This is a substantive due process right akin to the 'fundamental fairness' concept of procedural due process." *Wilson,* 770 F.2d at 586.

Plaintiffs' claims fall in this latter category. Their claims are premised on the alleged violation of a constitutionally protected liberty interest, within the meaning of the Fourteenth Amendment, in their personal bodily integrity. *See Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *see also D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1368 (3d Cir.1992) (*en banc*), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993).

We first note that, despite the plaintiffs' suggestions to the contrary, we have no doubt that the "shocks the conscience" standard is applicable here. Although this court has, on occasion, expressed some doubt about the utility of the "shocks the conscience" test in any arena other than that of excessive force, *see, e.g., Cassady v. Tackett*, 938 F.2d 693, 698 (6th Cir.1991) (citing *Braley*, 906 F.2d at 224–25), we have consistently relied upon this standard in a variety of contexts. And while we agree with its critics that the standard can be "fuzzy," *Braley*, 906 F.2d at 226, we have never adopted an alternative. The standard was, in fact, employed by this court in a case presenting largely the same issue as the one we address here. In *Webb v. McCullough*, 828 F.2d 1151 (6th Cir.1987), a student on a school trip locked herself in the bathroom after being caught with a boy and alcohol in her room by the principal. The principal

> tried to jimmy the bathroom door lock, but Webb would not let him in. He then slammed the door three or four times with his shoulder. The door finally gave way, knocking Webb against the wall. [The principal] then thrust the door open again, and it struck Webb again, throwing her to the floor. He then grabbed Webb from the floor, threw her against the wall, and slapped her. She then broke away and ran to her roommates.

*Id.* at 1154. In analyzing whether the principal's battery of Webb stated a constitutional claim, the court was careful to draw a distinction between "the type of battery at issue in the present case from ... *disciplinary* blows, inflicted as punishment for 'the proper education and discipline of the child.' ...

[T]he record does not demonstrate that the alleged blows inflicted upon Webb were in any way disciplinary." *Id.* at 1158. The court concluded that that lack of evidence

> raises the possibility that the alleged blows violated Webb's substantive Fourteenth Amendment[ ] due process rights:
>
> [T]he right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience ... [is c]learly recognized in persons charged with or suspected of crime and in the custody of police officers[. W]e simply do not see how we can fail also to recognize it in public school children under the disciplinary control of public school teachers.

*Id.* (citation omitted). The court cautioned, however, that a constitutional claim bears important differences from a simple tort claim:

> [W]e emphasize once more that the substantive due process claim is quite different than a claim of assault and battery under state tort law.... [S]ubstantive due process is concerned with violations of personal rights of privacy and bodily security.... [T]he substantive due process inquiry ... must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Id.* at 1158 (citation omitted). The court concluded that, on the record presented, "a trier of fact could find that ... [the principal's] need to strike Webb was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of [the principal's] official power, literally shocking to the conscience." *Id.* at 1159.

Bearing these words in mind, we turn first to the claim presented by Lillard. On the one hand, as in *Webb*, the record fails to reflect any legitimate disciplinary purpose occasioning the slap to Lillard. On the other

hand, it is simply inconceivable that a single slap could shock the conscience. We do not quarrel with a suggestion that Leventhal's actions were careless and unwise; but they fall far short of "brutal," or "inhumane," or any of the other adjectives employed to describe an act so vicious as to constitute a violation of substantive due process. In contrast to *Webb*, the blow inflicted here was neither severe in force nor administered repeatedly. Moreover, the slap did not result in any physical injury to Lillard. *Cf. Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980). While we do not mean to suggest that school systems should tolerate a teacher who slaps a student in anger, neither do we conclude that one slap, even if made for no legitimate purpose, rises to the level of a constitutional violation. While Leventhal should reasonably expect to face serious consequences for his treatment of Lillard, those consequences should not be found in a federal court through the mechanism of a section 1983 action.

■ The same is true with respect to Little's claims. Accepting all of the plaintiffs' allegations as true, the incident in the hallway, while deplorable, simply is not of the outrageous and shocking character that is required for a substantive due process violation. Leventhal's rubbing of Little's stomach, accompanied by a remark that could reasonably be interpreted as suggestive, was wholly inappropriate, and, if proved, should have serious disciplinary consequences for Leventhal. But without more, it is not conduct that creates a constitutional claim. It is highly questionable whether a single, isolated incident of this magnitude could even rise to the level of sexual harassment under Title VII. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). Under no circumstances, then, can it amount to "a brutal and inhumane abuse of ... official power, literally shocking to the conscience," sufficient to state a claim for the violation of substantive due process rights. *Webb*, 828 F.2d at 1159.

Accordingly, we conclude that the district court did not err in dismissing Lillard's and Little's due process claims.

## C.

We next consider the plaintiffs' arguments that the district court erred in dismissing Lillard's and Little's First Amendment claims on the ground that they were not stated with sufficient specificity. The plaintiffs argue that their pleading was adequate, because they alleged, generally, that they were retaliated against for complaining about Leventhal, and that Leventhal "penaliz[ed] students in their grades and their participation on his teams" if they or their parents complained. The complaint does not allege that these penalties were inflicted specifically on either of these plaintiffs, but only on students, generally. They argue that the First Amendment "provides protection for parents of their right to speak out without fear or actual retaliation."

■ As we have said, the standard of review of a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) is liberal. "'A complaint need not set down in detail all the particularities of a plaintiff's claim,'" but must simply "give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Gazette*, 41 F.3d at 1064 (citations omitted). It is plain that, although liberal, the standard does require that a plaintiff plead more than bare legal conclusions. "In practice, a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993) (internal quotation marks omitted) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). This court has held, in the context of a civil rights claim, that conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under section 1983. *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir.1986). "Some factual basis for such claims must be set forth in the pleadings." *Id.*

■ The Lillards' and Littles' First Amendment claims were properly dismissed. The complaint itself states nothing more than the barest of conclusory allegations of un-

specified retaliation, and the *post hoc* rationalizations provided in their brief are of no avail. The plaintiffs' vague assertions that they feared retaliation for their speech are empty, in the absence of some claim that Leventhal ever retaliated against them, or threatened to do so. The fact that they may believe he retaliated against someone else is of no moment, especially in light of the complete lack of an articulated basis for such belief.

### D.

We next consider whether the district court erred in granting summary judgment to the School Board, Superintendent Anderson, and Principal Chism in both his official and individual capacities. On McCarter's constitutional claims, summary judgment was granted on the ground that these defendants had no notice or knowledge of Leventhal's actions. The district court reached this issue as an alternative to its disposition of the claims against these defendants, in their official capacities only, on the grounds of Eleventh Amendment immunity. Because, as we shall explain, we conclude that the district court did not err in its determination of this issue, we need not reach the question whether these defendants are entitled to Eleventh Amendment immunity.

The plaintiffs argue that the district court improperly adopted Principal Chism's affidavit with regard to whether or not he had notice of Leventhal's behavior. They argue that there was evidence that the School Board, Superintendent Anderson, and Principal Chism were all on notice from various sources, and that all three also had authority to take action to rectify the problem of Leventhal. Therefore, they conclude, the failure of these supervisors to prevent Leventhal's substantive due process violation against Julie McCarter occasions section 1983 liability. The plaintiffs do not suggest that these defendants are liable because of a "special relationship" between McCarter, as a student, and the defendants, as school representatives, giving rise to an affirmative duty on the part of the defendants, *cf. D.R. by L.R.*, 972 F.2d at 1368, nor do they suggest that

these defendants took an affirmative act that increased the danger to McCarter, *cf. Graham v. Independent School District No. I–89*, 22 F.3d 991, 995 (10th Cir.1994).

We review the district court's grant of summary judgment *de novo*, employing the same test used by the district court. *Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). Thus, we view the evidence in the light most favorable to the nonmoving party, and determine whether all the evidence before the district court " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

Although McCarter may have stated a substantive due process claim under section 1983 based on Leventhal's conduct, the remaining defendants cannot be held liable simply on a theory of *respondeat superior. See Monell v. Department of Social Servs.*, 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978). A supervisory employee cannot be held liable under section 1983 for the constitutional torts of those he supervises unless it is shown "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). In *Bellamy*, the plaintiff argued that supervisory officials at the prison in which he was incarcerated should be subject to section 1983 liability because they failed to halt harassment of him by their subordinates. Several witnesses testified that supervisory officials were notified about harassment by prison guards but no action was ever taken. *Id.* The court concluded that "Bellamy has made no showing that any of the supervisory officials who were defendants in this case actively participated in or authorized any harassment of appellant. The testimony presented by Bellamy, at best, indicates that some instances of alleged harassment were

brought to the attention of prison supervisory officials." *Id.* On these facts, no supervisory liability could lie.

■ Viewing the facts in the light most favorable to the plaintiffs, the court must assume that these defendants had all been alerted, in some fashion, to some misconduct on the part of Leventhal. Even acknowledging this, however, cannot get the plaintiffs past *Bellamy*. As *Bellamy* makes clear, simply having some incidents of harassment brought to the attention of supervisory defendants is not sufficient to make them liable under section 1983. And here, there is, indisputably, no evidence that any of the supervisory defendants either encouraged Leventhal's behavior, or directly participated in it. The only information any of these defendants had was of isolated and apparently unrelated incidents of bad behavior by Leventhal. As such, *Bellamy* requires summary judgment in favor of the supervisory defendants.

### E.

The final issue we must address is whether the district court properly granted summary judgment to the defendants on the plaintiffs' Title IX claims, on the ground that those claims were barred by the statute of limitations. The plaintiffs argue that Principal Chism was put on notice of Lillard's claim that Leventhal had slapped her face, well within 180 days of the incident, and that the lawsuit filed on July 2 simply "confirm[ed]" Lillard's sexual harassment claim. Not surprisingly, no law is cited in support of this novel concept. No explicit argument at all is offered with regard to McCarter's Title IX claim.

The defendants, on the other hand, acknowledge that other circuits addressing the issue of the appropriate statute of limitations in similar contexts have used the applicable state personal injury statute of limitations, a fact not mentioned by the plaintiffs. The defendants argue, however, that this is incorrect, and that the court should use the 180-day period in Title VI. In the alternative, the defendants urge this court to dismiss the plaintiffs' Title IX claims because there is no basis for concluding that Leventhal's actions were discriminatory on the basis of sex.

■ As with any basis for summary judgment, a grant of summary judgment on the ground that a claim is barred by the applicable limitations period is reviewed *de novo* by this court. *Noble v. Chrysler Motors Corp.,* 32 F.3d 997, 999 (6th Cir.1994).

The first question we must determine is what limitations period is applicable to the plaintiffs' Title IX claims. Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The individual defendants have failed to make any mention of Title IX's apparent limited application to those who receive "Federal financial assistance," and the issue of whether the individual defendants are proper parties in a Title IX suit when, presumably, they are not recipients of federal financial assistance, has not been briefed or argued. We are, accordingly, reluctant to dispose of the Title IX claims on that ground. We note, however, our strong skepticism that these individual defendants can be held liable under Title IX. *See, e.g., Bougher v. University of Pittsburgh,* 882 F.2d 74, 77 n. 3 (3d Cir.1989); *Lipsett v. University* of Puerto Rico, 864 F.2d 881, 901 (1st Cir.1988). Nonetheless, despite our serious reservations, we will, because of the absence of any record on this issue, decline to fully address it at this juncture.

Title IX does not contain its own statute of limitations, but the corresponding regulations, 34 C.F.R. § 106.71, adopt the procedures applicable to Title VI, 42 U.S.C. § 2000d, *et seq.* Title VI regulations, in turn, provide that "[a] complaint must be filed not later than 180 days from the date of the alleged discrimination." 34 C.F.R. § 100.7(b) (1988). This limitations period, however, pertains not to judicial proceedings, but instead prescribes the period within which administrative proceedings must be initiated. Neither Title VI nor Title IX provide a limitations period expressly pertaining to judicial proceedings, a failure occasioned, no doubt,

by the fact that, for both statutes, private causes of action were implied by the courts. *Guardians Ass'n v. Civil Serv. Comm'n of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Title VI); *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Title IX). The question is, therefore, whether the period relating to administrative filings also establishes the period within which judicial proceedings must be filed.

Only one circuit case has, to date, decided the issue of what limitations period is applicable to a Title IX claim. In *Bougher,* 882 F.2d 74, the Third Circuit rejected the defendant's contention that 180 days was appropriate:

> The regulatory scheme for federal administrative review of an educational institution's compliance with Title IX is not the applicable standard to determine whether a judicial proceeding to enforce rights under Title IX has been initiated in a timely manner. "The practical difficulties facing an aggrieved person who invokes administrative remedies are strikingly different," from the difficulties which face an aggrieved person seeking judicial relief. We therefore must "borrow" the state statute of limitations in the cause of action most similar to the plaintiff's Title IX claim.

*Id.* at 77 (citations omitted). The *Bougher* court concluded that the most analogous state limitations period was, as in section 1983 and section 1985 claims, the period applicable to personal injury claims. *Id.; cf. Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 1942–43, 85 L.Ed.2d 254 (1985).

In addition to *Bougher,* a number of cases determining the limitations period for judicial proceedings under Title VI provide guidance by analogy. Indeed, all of the circuits deciding the issue have uniformly applied the state personal injury limitations period. *See Taylor v. Regents of Univ. of California,* 993 F.2d 710, 712 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 890, 127 L.Ed.2d 83 (1994); *Baker v. Board of Regents of Kansas,* 991 F.2d 628, 631 (10th Cir.1993); *Frazier v. Garrison I.S.D.,* 980 F.2d 1514, 1520–22 (5th Cir.1993); *Chambers v. Omaha Pub. Sch. Dist.,* 536 F.2d 222, 225 n. 2 (8th Cir.1976).

The great weight of authority, then, plainly favors applying, in this case, the Tennessee statute of limitations for personal injury claims, not the 180–day period for administrative filings named in Title VI. The Tennessee limitations period for personal injury claims is one year. TENN.CODE ANN. § 28–3–104(a); *see Jackson v. Richards Medical Co.,* 961 F.2d 575, 578 (6th Cir.1992).

Surprisingly, at oral argument, the attorney for the plaintiffs insisted that the 180–day administrative period governed these claims, even though that would have the almost certain result that two of the plaintiffs' claims would be time-barred. While we are loathe to give the plaintiffs a gift they apparently do not want, our obligation is to decide the case correctly. Therefore, because we believe the cases applying state personal injury limitations periods to Title IX and Title VI claims, and *Bougher* in particular, are well-considered and correctly decided, we adopt that reasoning today.

We conclude that the district court erred in applying the 180–day limitations period provided by Title VI for administrative filings. Instead, the applicable limitations period should be the one-year period provided under Tennessee law for personal injury actions. Any claims that arose on or after July 2, 1991, are, therefore, not time-barred.

As a postscript, we reject the defendants' invitation to address the plaintiffs' Title IX claims on their merits. The substance of the plaintiffs' claims was not addressed by the court below, and has not been adequately briefed on appeal. For example, as previously pointed out, no party has as yet addressed the federal financial aid issue, and there may be an abundance of other such issues lurking about, of which we are unaware. Moreover, we, sitting as a court of review, are poorly situated to conduct the necessarily fact-based inquiry in the first instance. We shall, therefore, rely on our general rule, and decline to address an issue not raised below. *See Foster,* 6 F.3d at 409.

### III.

We **REVERSE** the district court's judgment in part, and **AFFIRM** in part, and

**REMAND** for further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in the court's judgment.

With respect to the dismissal of the § 1983 claims, it does not seem to me that the plaintiffs have alleged a deprivation of "liberty" as that term is used in the Constitution. If there was no deprivation of liberty here, I do not believe that there was any violation of the Constitution—whether or not the behavior attributed to Mr. Leventhal was sufficiently gross to shock the judicial conscience.

The Supreme Court no longer sanctions use of the "shocks the conscience" test to analyze claims of excessive use of force. See *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Although the Supreme Court apparently assumes that this rather fuzzy test has some continuing role, see *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), and subsequent to *Graham v. Connor* a number of courts of appeals, including this one, have applied the test in a variety of other contexts, I see no reason for us to do so here.

But whether the dismissal of the § 1983 claims is upheld on the ground I have suggested or on the ground that the conduct attributed to Mr. Leventhal does not shock the conscience—and I agree, if this is the test, that the alleged conduct does not reach a conscience-shocking level—I see no reason to decide whether the dismissal could also be upheld under the *National Sea Clammers* doctrine. Perhaps the Third Circuit is wrong in holding that constitutional claims under § 1983 are "subsumed" in Title IX of the Education Amendments of 1972, but it is not necessary for us to reach that issue in the case before us. I would refrain from doing so.

With respect to the issues addressed in Parts IIC and IID of the court's opinion, I agree both with the conclusion that the judgment of the district court should be affirmed and with the reasoning on which that conclusion rests.

With respect to the granting of summary judgment against plaintiffs Andrea Lillard and Julie McCarter on their Title IX claims, I was originally inclined to affirm insofar as Superintendent Anderson and Principal Chism are concerned—not on statute of limitations grounds, but because I do not believe that Title IX can appropriately be read as subjecting anyone other than educational institutions to liability for violation of its terms. See *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988) ("the separate liability of the supervisory officials at the University must be established, if at all, under § 1983, rather than under Title IX"); *Clay v. Board of Trustees of Neosho County Community College,* 905 F.Supp. 1488, 1495 (D.Kan.1995) ("Title IX actions may only be brought against an educational institution, not an individual acting as an administrator or employee for the institution"); *Doe v. Methacton Sch. Dist.,* 1995 WL 549089, at *1 (E.D.Pa. Sept. 12, 1995) ("courts which have addressed the issue have held that only institutions, not individuals, may be liable under Title IX"); *Bowers v. Baylor Univ.,* 862 F.Supp. 142, 145 (W.D.Tex.1994); and *Doe v. Petaluma City Sch. Dist.,* 830 F.Supp. 1560, 1576 (N.D.Cal.1993) ("individuals may not be held personally liable under Title IX"), *rev'd on other grounds,* 54 F.3d 1447 (9th Cir. 1995). Because this issue has not been briefed or argued here, however, and because other claims remain pending against the superintendent and the principal, I do not dissent from the court's decision to let the Title IX issue be decided in the first instance by the district court.